IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:21-cr-77 |
| | ) | |
| v. | ) | Sentencing Date: July 16, 2021 |
| | ) | |
| ANDREW ALEXANDER TEZNA | ) | Hon. Claude M. Hilton |
| a/k/a N. ANDREW TEZNA | ) | |
| a/k/a NESTOR ANDRES TEZNA | ) | |
| | ) | |
| Defendant | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Raj Parekh, Acting United States Attorney; Kimberly M. Shartar and Jamar K. Walker, Assistant United States Attorneys, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G."), files this Position of the United States with Respect to Sentencing of Defendant Andrew Alexander Tezna (hereinafter "the defendant" or "Tezna").

The United States submits that the Probation Officer correctly calculated the Sentencing Guidelines level to be 16, which results in a 21 to 27 months advisory Guidelines range. Based on the factors set forth in 18 U.S.C. § 3553(a), the United States requests that this Court impose a sentence at the low end of the Guidelines range, three years of supervised release, order restitution in the amount of $285.449.11, as agreed upon by the parties, and order forfeiture in the amount $285.449.11, as detailed in the agreed upon forfeiture order.

## I.     BACKGROUND[1]

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP").  PPP loans are obtained by submitting an application to a financial institution along with supporting documentation as to the business's payroll expenses.  The loan is then 100% guaranteed by the Small Business Administration ("SBA").  PPP loan proceeds must be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The CARES Act also authorized the SBA to provide Economic Injury Disaster Loans ("EIDL") to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  Unlike PPP loan applications, EIDL applications are submitted directly to the SBA.  And finally, as part of the CARES Act the federal government provided assistance to states so that employees who lost their jobs as a result of the pandemic could receive increased unemployment benefits.

From January 2015 through May 2021, the defendant worked as a full-time employee of the National Aeronautics and Space Administration ("NASA"), where prior to his departure he made $181,000 and had been a Senior Executive Service ("SES") employee in the Office of the Chief Financial Officer since June 2020. Dkt. 9 at ¶ 1; Dkt. 15 at ¶ 102.   Between May 18, 2020

---

[1] The PSR and the Statement of Facts ("SoF") signed by the defendant, dkt. 9, adequately set forth the offense conduct in this case.

and May 29, 2020, while he was a full-time NASA employee, the defendant applied for three PPP loans, one in the name of his wife's "side" business, Andalasia Designs[2], one in his mother-in-law's name, B.I., and one in his own name, Nestor Tezna.[3] Dkt. 9 ¶¶ 1-2, 17-28. As to the Andalasia Designs PPP loan application, the defendant listed his wife's social security number, submitted a copy of her driver's license, and signed the application as her. *Id.* at ¶ 17. As to the B.I. PPP loan application, the defendant listed his mother-in-law's social security number, submitted a copy of her driver's license, and signed the application as her. *Id.* at ¶ 21. On all three loan applications, the defendant claimed there were significant average monthly payroll expenses: $34,700 for Andalasia Designs, $29,567.50 for B.I. and $69,186 for his own "company." *Id.* at ¶¶ 17a, 21a, 25a. In actuality, Andalasia Designs had no regular monthly payroll expenses and the businesses in the name of B.I. and Nestor Tezna did not exist. *Id.* In support of all three loans, the defendant created and submitted fabricated IRS Forms Schedule Cs. *Id.* at ¶¶ 18, 22, 26. And, for one of the loans, he created fabricated payroll records. *Id.* at ¶ 18. All three PPP loans were funded resulting in him receiving $246,884 from one financial institution and $25,400 from another. Dkt. 15 at ¶ 61. Of course, none of the funds went to business purposes the defendant claimed they would be used for. Instead, he spent the funds on a litany of personal expenses, including paying off over $140,000 in personal credit card debt,

---

[2] The defendant's wife also was a full-time government employee. The defendant claimed on a fake Form 1040, Schedule C, Profit or Loss from Business ("Schedule C") provided in support of the PPP loan that Andalasia Designs had "Gross receipts" of $172,810 and "Total expenses" of $51,060 in 2019. However, in reality Andalasia Designs grossed only $7,260 in income in 2019.

[3] The defendant legally changed his name from Nestor Tezna to Andrew Tezna after he applied for the PPP loan.

3

paying off $48,961 on loan for a residential swimming pool, paying off $18,447 on an auto loan for a Toyota Sienna, paying $7,200 for home improvements, paying $6,450 to a dog breeder, paying nearly $5,000 for a down payment for a Land Rover SUV (which he traded in months later for another vehicle) and paying $2,500 for Disney Vacation Club dues. Dkt. 9 at ¶¶17b, 17c, 20a, 20b, 21b, 21d, 24a, 24b, 25b, 25d, 28a, 28b, 28c, 28d, 28e. Not only did the defendant apply for PPP loans, he also applied for EIDL funds twice in the name of Andalasia Designs. *Id.* at ¶¶ 29-30. He first sought one for $63,000 on May 20, 2020, and then sought another loan on June 29, 2020 for $6,500. *Id.* However, both of these loans were denied. *Id.* Finally, as related to the CARES Act, despite knowing that his mother-in-law had been retired since 2016, and therefore ineligible for unemployment benefits, the defendant applied for and received unemployment benefits in her name. *Id.* at ¶ 32. He did so by fraudulently posing as her, using her social security number and date of birth, claiming that she had been laid off from her "nanny" position due to COVID-19 and that she was actively seeking employment; neither which were the case. *Id.* at ¶¶ 31-32. As a result, between May 4, 2020 and October 19, 2020, the defendant received 21 payments totaling $15,950, for which he had to make weekly claims to receive the funds. *Id.* at ¶ 33.

    Finally, unrelated to the CARES Act, the defendant was required to file a Public Financial Disclosure Report, OGE 278e, because of his SES position with NASA. *Id.* at ¶ 34. In a filing made on June 23, 2020, he made multiple materially false statements. *Id.* One was related to C.M., another NASA employee, who he hired, first directly supervised and later indirectly supervised and was a friend of his and his wife. *Id.* at ¶¶ 3, 34-34a; Dkt. 15 at ¶¶ 57-58. C.M. paid the defendant approximately $1,900.00 biweekly since November 2019. *Id.*

4

During the period being reported on the Disclosure Report, C.M. paid the defendant at least $46,200. Dkt. 9 at ¶34a. However, these payments were reported nowhere. *Id.* If C.M. owed the defendant any money for any reason that he required regular repayments, well that would be a loan—i.e. a Note Receivable, which should have been reported as an "other asset" on the Report. If the funds were for rent or some other service, then the amounts should have been reported as "other income" on the Report. And, if C.M. was simply giving the defendant money out of the kindness of her heart, it should have been reported as a gift. All of these categories were available, and yet the defendant did not report any of the funds he received from C.M. Furthermore, as referenced above, the defendant had a significant amount of personal debt, however, he underreported these liabilities by at least $36,000 on his Report. *Id.* at ¶34b.

On December 22, 2020, the defendant was interviewed by federal law enforcement about the PPP loans. Dkt. 15 at ¶56. As such, he was well aware of the criminal investigation of his crimes. On January 19, 2021, he sold his home in Leesburg Virginia and he netted $121,474. *Id.* at ¶109. During his interview with agents, he told them that he was going to use the funds from the sale of his house to repay the loans. *Id.* at ¶56. However, the defendant did not use those funds to make substantial payments towards his PPP loan liability as claimed (he did make a payment of $2,784.99). *Id.* at ¶¶61, 64, 109. Instead, he purchased a new home in Florida (Somerset Park Drive). *Id.* at ¶109. He paid $53,623.50 as a down payment, *id.*, and there is a mortgage on the home for $483,000 (meaning the house was purchased for north of $500,000, which is corroborated by its value on the assets list). *Id.* at ¶107. The defendant also used the proceeds from the sale of his Leesburg home to pay down credit card debt of at least $15,000, *id.* at ¶109.

On April 19, 2020, the defendant pleaded guilty to a single count of bank fraud, in violation of 18 U.S.C. § 1344.  Dkt. 7.  In his plea agreement, the defendant agreed that the total loss was $357,734, which includes the PPP loans disbursed (an actual loss of $272,284), the EIDL funds sought (intended loss of $69,500), and the fraudulent unemployment benefits received (actual loss of $15,950).  Dkt. 8 at ¶4; Dkt. 15 at ¶ 63*;* Dkt, 9.

## II.     THE  APPROPRIATE GUIDELINE RANGE

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Sentencing Guidelines are now advisory.  543 U.S. 220, 264 (2005).  "In the wake of *Booker* . . . the discretion of sentencing court is no longer bound by the range prescribed by the guidelines.  Nevertheless, a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker,* 543 U.S. at 264).  In fact, the Fourth Circuit has noted that "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005).  Thus, "sentencing courts are not left with unguided and unbounded sentencing discretion." *United States v. Green,* 436 F.3d 449, 455 (4th Cir. 2006).

Here, the United States agrees that the appropriate Guidelines range with respect to incarceration is 21 to 27 months.  The total offense level of 16 results from a base offense level of 7, increased by 12 levels for the corresponding to loss of over $250,000 but less than $550,000, and a 3 level reduction for the defendant's acceptance of responsibility and timely

6

notification to the United States of his intention to plead guilty.[4]  The United States asks this Court to adopt the PSR's findings and advisory Guidelines range.

### III. THE FACTORS SET FORTH IN SECTION 3553(A) AND RECOMMENDED SENTENCE

After calculating the appropriate guidelines range, "the court must 'determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006) (quoting *Green*, 436 F.3d at 455).  Those factors include the nature of the offenses, the characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, afford deterrence, protect the public, and provide the defendant with needed educational or other training.  18 U.S.C. § 3553(a).  The Court need not weigh the factors equally, but must consider each of them.  *United States v. Fowler,* 948 F.3d 663, 674 (4th Cir. 2020).

The defendant is a smart and business savvy individual.  Prior to NASA, the defendant worked for prestigious companies by being a consultant at Price Waterhouse Coopers and an analyst at Booz Allen.  Dkt. 15 at ¶¶103-104.  The defendant is well educated, having a BS in marketing from George Mason University and a master's degree in accounting.  *Id.* at ¶¶99-100.  However, despite being well educated and climbing into the high ranks of government service, the defendant brazenly submitted three fraudulent PPP loan applications, in a two week period,

---

[4] As noted here, the PSR includes a three-level decrease for acceptance of responsibility.  In this respect, the United States agrees that the defendant qualifies, pursuant to U.S.S.G. § 3E1.1(a), for a two-level reduction.  In addition, the defendant timely notified the United States of his intention to plead guilty, thus permitting the United States to avoid preparing for trial and to allocate its resources more efficiently.  Accordingly, the United States hereby moves, pursuant to § 3E1.1(b), to decrease the defendant's offense level by one additional level.

each higher than the prior one, submitted two fraudulent EIDL applications, applied for unemployment benefits in the name of his mother-in-law, who had no right to the funds, and during the same time he was committing his fraud, he lied on his NASA disclosure[5] regarding a financial relationship he had with a subordinate and about his personal liabilities.

      The defendant took advantage of two special programs meant for American businesses and unemployed individuals struggling amidst unprecedented economic disruptions due to the COVID-19 pandemic. The PPP loan applications were filed in quick succession (Andalasia Designs on May 18, B.I. on May 22, Nestor Tezna on May 29) with each new application coming after the success of the prior PPP loan disbursement ($25,400 on May 20, $73,918 on May 26, and $172,966 on June 4). Dkt 9 at ¶¶17, 21, 25, 19, 23, 27. And as the defendant found success in his fraud, he kept applying for larger loans—his greed grew. And at the same time, he made weekly applications for unemployment benefits using his mothers-in-law's identity. *Id.* at ¶33. These were not one-off mistakes, but were conscious and deliberate efforts. Instead of being happy and successful as an high ranking government employee, who had reached the prestigious rank as an SES employee making more than $180,000 a year, the defendant exploited the fact that the PPP program and unemployment benefits were designed to release funds as quickly as possible in order to provide a life-line to businesses and individuals across the country. Further, the fraudulently obtained funds did not simply stay in his bank account, nor did he make any real efforts to repay the PPP loans. Instead, he made

---

[5] Given the defendant's accounting background and that he worked in NASA's Office of the CFO, the defendant well understood the financial disclosures he was signing and that the $1,900 he received regualrly from a subordinate had to be accounted somewhere, whether as loan receivable, income, or as gift.

8

use of the funds all to his personal and financial benefit; he made significant payments on loans and credit card debt, all the time he was still incurring more credit card debt with new purchases, he bought a Land Rover, paid a dog breeder, and made improvements on his home. Dkt. 9 at ¶¶ 20a-b, 24a-b, 28a-e.  And even after the government confronted him with his crimes in December 2020, dkt. 15 at ¶ 56, during which the defendant claimed his actions were a mistake and he would use the funds from the sale of his home to repay the loans, he did not make efforts to repay the loans when he soon could.  In January 2021, a month later, the defendant sold his home for a gain of $121,474.  *Id.* at ¶109.  However, instead, of moving into his rental property in Florida (Lara Circle), or renting a home, he purchased another home valued over $500,000, continued to incur more credit card debt, took out new personal loans, and used the sale proceeds from the Leesburg home to pay down the debts he had continue to incur. *See id.*  at ¶¶107-110.

       The defendant used his wife's and mother-in-law's identities, by using their names, date of births, social security numbers, and driver's licenses, to commit his crimes.  Dkt. 9 at ¶¶17, 21, 31.  While the Guidelines do not account for him stealing their identities, because §2B1.1(11) does not apply, these acts should be considered with the 3553(a) factors, specifically the nature of his crimes, when determining his sentence.  Additionally, the fact that as an employee in the Office of the CFO, he would dare to lie on a Financial Report, about his own financial matters and about his financial relationship with a subordinate employee who he hired, is significant. However, these actions are not considered in the Guideline's calculation, as there is no fraud loss amount for false Report.  This crime should also be considered when weighing all of the 3553(a) factors.

9

Because of the defendant's education, his senior position at NASA, the nature and breadth of his crimes, and his use of the fraud proceeds to his own personal benefit, the United States recommends that he be given a sentence at the low end of the Guidelines.

### IV. FORFEITURE AND RESTITUTION

Pursuant to the plea agreement, dkt. 35 at ¶10, the defendant and the government have agreed to the attached consent forfeiture order, which includes forfeiture totaling $285,449.11, and to the attached restitution order, which includes restitution also totaling $285,449.11.  Ex. 1 and 2. Ex. 2.

### CONCLUSION

For the reasons stated, the United States respectfully requests this court to sentence Andrew Tezna to a period of incarceration at the low end of the Guidelines and to 3 years of supervised release.  Such a sentence is reasonable and accounts for each of the factors set forth in 18 U.S.C. § 3553(a).  Finally, the government requests that the court enter the agreed upon consent forfeiture order and restitution order.

Raj Parekh
Acting United States Attorney

        /s/
Kimberly M. Shartar
Jamar K. Walker
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700

10

## **CERTIFICATE OF SERVICE**

      I hereby certify that on July 9, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to all counsel of record:

By:         /s/
      Kimberly Shartar
      Assistant United States Attorney
      United States Attorney's Office
      Justin W. Williams U.S. Attorney's Building
      2100 Jamieson Avenue
      Alexandria, VA 22314
      Telephone: 703-299-3700
      Email: kimberly.m.shartar@usdoj.gov