IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | CASE NO.:  1:21-cr-77-CMH |
| ANDREW TEZNA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Andrew Tezna ("Mr. Tezna") hereby respectfully submits this Sentencing Memorandum to assist the Court in determining a reasonable sentence that is sufficient, but not greater than necessary, to satisfy the factors set forth in 18 U.S.C. § 3553(a).

We agree with the Probation Office and the Government that the applicable advisory sentencing guidelines range in this case is 21 to 27 months. We believe, however, that a substantial downward variance from that advisory range would be the appropriate sentence for Mr. Tezna primarily due to the unique family circumstances present in this case.

**1. The nature and circumstances of this offense support a substantial variance from the advisory sentencing guidelines range.**

Mr. Tezna entered a guilty plea to one count of bank fraud for filing fraudulent loan applications in an attempt to receive CARES Act funds. The

stipulated offense conduct is accurately stated in the PSR. (PSR ¶¶ 34-52). Although the total amount actually received by Mr. Tezna was $288,234.00, he is being held accountable for a total of $357,734.00 because of two loan applications that were rejected and not funded. Mr. Tezna has not disputed the amount of intended loss in this case, nor has he attempted to provide any excuse for his conduct. From the moment he was first approached by investigators, Mr. Tezna fully admitted responsibility for what he did. (PSR ¶ 56).

In an attempt to document how the loan proceeds were spent by Mr. Tezna, the Government identified a number of specific expenditures that would have not been authorized by the CARES Act program. (PSR ¶¶ 39, 43, 47). As the PSR shows, and as Government points out in its Position Statement (Doc 16), the vast majority of the CARES Act loan proceeds received by Mr. Tezna were used to pay down debt incurred by him and his family. There is no record here of exceptionally lavish spending on luxury items.

Although the loan proceeds were commingled with Mr. Tezna's legitimate income, the PSR identifies a few specific transactions that they attribute to his use of the CARES Act funds. They include paying off an auto loan for a 2015 Toyota Minivan, paying off a loan for their swimming pool, a down payment for the family SUV, around $7,000.00 worth of home improvements, and $2,500.00 in payments for their existing timeshare at Disney. The only expenditure that appears

excessive is a $6,450.00 payment to a dog breeder (PSR ¶ 47). Understandably, the Government included this specific expenditure in their press release announcing Mr. Tezna's guilty plea in this case. (Exhibit 14). Counsel inquired about this transaction as was informed by the Tezna family that this money went to buy a new puppy for the children because their 14-year-old lab was in poor health and expected to die soon. Yes, they bought an expensive dog – a French bulldog that was supposed to be "hypoallergenic" –when they probably could have adopted one from the local shelter. But this expense, like many of the others, was consistent with Mr. Tezna's desire to keep his wife and kids happy. Mr. Tezna did not use the loan proceeds to buy himself expensive jewelry, to fund personal luxury travel, or to acquire any other selfish expenditure like the ones the Court has no doubt seen in other fraud cases. He spent his money on his wife and kids.

There is no question that Mr. Tezna's actions in this case were driven by the significant amount of unsecured debt he had burdened his family with over the years. Despite what appears to be a background in accounting and finance, he is admittedly very bad at managing his own money. (PSR ¶ 57; Exhibit 13). He also tends to overspend on his family, probably in part due to his own personal upbringing. (Exhibit 1). But Mr. Tezna's actions in this case do not in any way suggest that he is some sort of serial fraudster or is at heart a deceitful person who would likely commit fraud again.

The availability of CARES Act funds, and the relatively easy application process, presented opportunities for both the traditional, squirrely fraudsters and people like Mr. Tezna who were just living well above their means. This does not excuse Mr. Tezna's behavior, but it would be a mistake to put him in the same category of people who are always looking for an opportunity to steal from someone to enrich themselves. There is also no evidence, despite the Government's suggestion in its press release (Exhibit 14), that the CARES Act money obtained by Mr. Tezna in any way prevented a qualified applicant from also receiving a loan.

**2. Mr. Tezna's personal history and family responsibilities support a substantial variance from the advisory sentencing guidelines range.**

Andrew Tezna moved to the United States from Colombia when he was 13-years old. (PSR ¶ 87). Even as a teenager, he was a hard worker. He helped his mother build a residential cleaning business shortly after the family arrived from Colombia. (Exhibit 1). He worked extremely hard to learn English so that he could speak like an American, and he excelled at school. He was involved in many extra-curricular activities, including participating on the track team where he went from an overweight kid who could not run a mile to winning an award for the most improved athlete. He then went to college at George Mason University where he got his degree in four years while also working full-time to help support himself. (PSR ¶ 99; Exhibit 1).

As the Court may be aware, Mr. Tezna worked for six years at NASA. (PSR ¶ 102). He quickly worked his way up within that agency to become a Senior Executive Service (SES) employee and was named Director of Policy. His performance reviews at NASA were exemplary and he was sent by that agency to attend Harvard University's Senior Executive Fellowship Program. As a result of this offense, Mr. Tezna lost that position and the $181,000.00 annual salary it provided. He is currently working as a full-time loader at Lowes Home Improvement Center making $14.00 per hour (PSR, ¶ 101). Prior to being charged with this offense, Mr. Tezna has had absolutely no involvement with the criminal justice system either as an adult or a child. (PSR ¶ ¶ 79-84).

Although this is his first experience with the criminal justice system, Mr. Tezna has never attempted to hide or minimize what he did with his family, his employer, or his close friends. In fact, while this case was pending, Mr. Tezna joined a support group for white collar offenders that has a stated purpose of helping people accept responsibility for their actions, acknowledge the pain and loss they have caused to others, and attempt to rebuild their lives. Mr. Tezna has fully participated in this group and has received the support of its founder, Rev. Jeff Grant.

5

In his letter to the Court, Mr. Grant writes

> *"Andy has participated in weekly online support group meetings, and in other online meetings we hold. He has assertively taken on increasing responsibility in the support group and is involved in the betterment of his fellows. He has regular phone and video calls with other members of our support group. ... [Andy] was incredibly well received because of his candor and absolute acceptance of responsibility for his behavior and crimes. It is not often that someone in the beginning of their criminal justice journey can possess the kind of self-awareness, dedication to his recovery and desire to make amends to those he harmed that Andy has shown."*

(Exhibit 5).

A number of family members and close friends have provided letters in support of Mr. Tezna that are attached to this memorandum. (Exhibits 1-12). Reading these letters, it is obvious that everyone who knows Mr. Tezna considers him to be a dedicated family man.

Mr. Tezna has two small children - a 6-year-old boy (Mason) and a 3-year-old (Emma). (PSR ¶ 89). Having children was not easy for Mr. Tezna and his wife. In her letter to the Court, Ms. Tezna writes about how her husband helped her through *"numerous pregnancy losses, including one in the second trimester where I almost lost my life."* (Exhibit 1).

Fortunately, Mr. and Ms. Tezna were eventually blessed with two wonderful children who are the focus of their life. Emma is a normal, rambunctious, and perfectly well-adjusted little girl. Mason, however, is autistic and has a number of

6

emotional and developmental challenges that require a significant amount of extra support. (PSR ¶ 89; Exhibits 1 and 3).

In her letter to the Court, Ms. Tezna describes her son in this manner

> *"Our son is a special needs child, diagnosed as having autism, ADHD, and extreme separation anxiety. He has fully bonded and relies on his father to keep himself feeling well, safe, supported and grounded. ... I am very worried and concerned for our son's ability to handle the loss of his father for any length of time...Mason's world is grounded only by maintaining a consistent environment, he relies on daily pattern activities which are tasks shared by Andy and I. Andy prays with our kids every night and is adamant that they are grateful for their life and teaches them to pray for special people in their life."*

(Exhibit 1).

As the Court may be aware, Mr. Tezna and his family relocated to Florida after his guilty plea in this case. Given the logistics of having his family travel back to Virginia for Court, Ms. Tezna recorded a short video with her children for the Court's consideration. (Please click on the picture to access the video.)

7



Mr. Tezna understands that he has failed his family and his country by committing this offense. He knows that put himself in this position, and that no one else is to blame for the possibility that he will be separated from his family as a consequence of his actions. But none of that will make any difference to his children, especially Mason. There is no question that, if Mr. Tezna is sentenced to custody, Mason will suffer. Mason will suffer much more than most children of incarcerated parents because of his disability and his exceptionally close relationship with his father. Because Mason is the child he is, even a short separation from his father may have potential life-long consequences.

Ms. Tezna describes the relationship between Mason and his father best, but close family friends have also observed their closeness. In his letter to the court, Charles LaRock writes

> *"I have had the opportunity to watch [Andy] become and grow as a father for almost 7 years now. ...Within the last year, his son Mason was diagnosed to be on the autism spectrum. Andy has been nothing but a loving and supportive father to Mason during the entire time. Andy and Mason have a wonderful and special relationship. They are best buds."*
> (Exhibit 3).

In addition to the time and attention needed to care for Mason, Mr. and Ms. Tezna have been actively involved in a support group for special needs children. Nicole LaRock writes of a particular occasion where Andy played a special role

> *"When we were providing entertainment for a fairytale prom for special needs children and couldn't find a volunteer to play 'Prince Charming,' Andy happily put on the costume and smiled and danced the night away, both supporting his wife's project and providing a magical experience for kids who very much deserved a night of magic."*
> (Exhibit 4).

Mr. Tezna's love and concern for his family extends beyond his wife and kids. In her letter to the Court, his mother-in-law writes

> *"[Andy], without hesitation, offered to not only take me in, but also my own mother who was in the advanced stages of Dementia and Alzheimer's. There were many times in the end with great humility I watched him help her as she lost her ability to perform even the most basic of tasks like walking to her bed or using the restroom. With much tenderness and care, he aided her ensuring that she never once felt less than the young human being she had once been. I will never forget the love and support he provided for her and the way her eyes lit up with joy when he would check on her, spend time with her and bring her meals."*
> (Exhibit 2).

It surely comes as no surprise to the Court that a defendant's lawyer is suggesting that a sentence of incarceration will cause the defendant's family to suffer, and that this suffering should be taken into consideration when imposing a sentence. Defendant's families are often additional victims of defendants' crimes. In the usual case, Counsel understands that this would not be a sufficient reason for a sentence reduction. But this case is exceptional. Mr. Tezna knows he put himself in this position and he regrets it every day, and it is appropriate that he be punished. But Mason, who is not only autistic but has extreme separation anxiety, will never understand why he's also being punished. He will only suffer the absence of a loving and devoted father.

3. **A custodial sentence is not necessary to satisfy the need for general and specific deterrence in this case.**

Mr. Tezna has not yet been sentenced by this Court, but he is already suffering the consequences of his actions. He went from a coveted SES position at a revered agency like NASA to a stock worker at a Lowe's home-improvement store. It is highly unlikely he will ever again hold a position of trust given his conviction. Before he worked with NASA, he was employed by accounting and consulting firms who generally run away from anyone with a fraud conviction. His career is over, his future employment prospects are dim, and he will now have to support his family with the baggage of a federal fraud conviction. It is going to be

even more difficult for Mr. Tezna to start a new career when anyone who "Googles" his name will see a number of news articles about his fraud conviction generated primarily by the Government's press release.

Of course, the Government has every right to issue a press release to publicize convictions it has obtained in connection with CARES Act fraud. We understand that media attention to this and similar cases provides general deterrence to individuals who may be inclined to consider applying for money that they are not entitled to receive. In fact, we think the goal of deterrence is mostly achieved by this public conviction, the loss of a great job, and the other collateral consequences it has created.

The sentences imposed in other CARES Act fraud cases, including a recent case before this Court, also provide sufficient deterrence to the community. The case recently before this Court most similar to Mr. Tezna's appears to be a case where one defendant received a sentence of "time served" and the other defendant received a 12-month sentence. (*US v. Monika Jaworska and Tarik Jaafar*, Docket No: 1:20-cr-00185-CMH). In that case, the defendants appear to have been involved in a *much* more significant and extensive scheme fraud than the loans obtained by Mr. Tezna. Regardless, the sentences imposed in that case, and the many other CARES Act fraud cases in this district and elsewhere, provide

sufficient general deterrence that would not be materially advanced or diminished by any sentence the Court may impose in this case.

## CONCLUSION

For these reasons, Counsel for Mr. Tezna respectfully suggest that a significant downward variance from the Advisory Guidelines is warranted in this case. Specifically, a term of probation with home detention would allow Mr. Tezna to continue to maintain his family responsibilities and would be sufficient but not greater than necessary to satisfy the sentencing goals of 18 U.S.C. § 3553(a).

This 12th day of July, 2021.

/s/ Page A. Pate
Page A. Pate
PATE, JOHNSON & CHURCH, LLC
101 Marietta Street, N.W.
Suite 3300
Atlanta, GA 30303
404-223-3310 (office)
404-223-3392 (fax)
Page A. Pate

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter.

This 12th day of July, 2021.

                                            /s/ Page A. Pate
                                            Page A. Pate
                                            PATE, JOHNSON & CHURCH, LLC
                                            101 Marietta Street, N.W.
                                            Suite 3300
                                            Atlanta, GA 30303
                                            404-223-3310 (office)
                                            404-223-3392 (fax)
                                            Page A. Pate